Good morning, Jim Gabler here on behalf of Allvoice Computing. Well, this is a case about how much detail a software patent must have in order to be held in ballot. The bulk of the claims in this case are means plus function claims that were found to be indefinite. But this is not a case in which the structural references in the specification do not have to be clearly linked to the claims. And in general, everyone seems to agree that it is in the specification that corresponds to the claims. And it's also not a case in which the references in the specification do something other than what is claimed in the claims. Rather, it's a case in which the flowcharts, concept diagrams, and the accompanying text do not, in the view of the district court, have enough detail to explain how the recited function was carried out. What should be the base start for that? Or should it be a person of ordinary skill in the art? How much input should a person of ordinary skill in the art be required to make in order to fill in the gap? Well, I think the knowledge of the person of the skill in the art is critical because the patent is written for those people. And we can't construe the patent without looking at it from their perspective. And I think that that is one of the mistakes the district court made in this case, was saying that, well, there's a structural reference here, but I'm not going to call it structure, even though there's testimony that a person of skill in the art would understand. Who's the skilled in the art person here? That is someone who has a degree in computer science or something equivalent and a few years of programming acquaintance. So what I'd like to persuade you is that- Would someone of that skill be able to understand the dynamic data exchange protocol? Absolutely. The DBE is essentially a chain link that essentially performs all those functions? They would understand it to be a communication channel, so to speak, that is compatible with multiple destination applications. Although the format of the data that's transmitted through it might vary depending on the destination application, the actual process of writing the code to do that formatting is, in the words of all voices expert, a trivial matter. So yes, software instructions that are addressed to DBE, they would understand the scope of that claim to be something that is compatible with more than one application. Would one be compatible with all windows then or anything else? It would be compatible with anything that operates in Windows that is capable of receiving communications from another application that's DBE compliant. So someone reading it would be able to take a look at DBE and know exactly what it means? Oh, absolutely. They would know that the DBE and its equivalents, other messaging facilities of the Windows operating system, are capable of transferring data, such as the output from a speech recognition. In any of the channels? I'm sorry? In any of the channels, you're not putting the required- In any one of the different computer-related applications? You'd be able to hook up to any one of them? If they're DBE-compliant. I mean, all the claim requires is that it works with more than one. And there's definitely more than one DBE-compliant application. That was part of the problem, though, wasn't it? I had the impression that the judge thought that the claims were of such breadth that they embodied subject matter which may not have been described or included, and that if sustained, could be enforced against subject matter that wasn't described in the specification. And therefore, he raised the best mode issue, as well as his evidence. Well, in terms of this claim, I don't see how an indication of using DBE as an output means is especially broad. I mean, it's something that anything that is outputting data or text to another application would use. So I don't see how that it's so broad that someone reading it would think that it could be anything, that they wouldn't know that it were to write instructions to send out texts using DBE. I don't know, because I couldn't tell. And the trial judge wasn't that explicit. But looking at the reason, it looked as if that was a factor that was being considered. That is, that the breadth didn't contain the limitations. Well, I think what the lower court said as to DBE is that there's no, that he credited what all voices, experts said about DBE. But he said, one, there's not an algorithm. And I'll have more to say about that later. And second of all, it doesn't say whether it's compatible with multiple destination applications. And how it does it. But the algorithm, I don't really understand that line of reasoning. Because he found DBE inappropriate as a construction claim for Claim 64. So even among the district court's concept of algorithmic DBE, the disclosure of DBE seemed to be appropriate. As to whether it's compatible with multiple destination applications, that's something that persons at school in the arc know. And in terms of how, I think how is an enabling question. Yes, a person at school in the arc might have to write an instruction with varying format or structure of the data that it's sending out. But if that's a trivial matter, and there's testimony that it is a trivial matter, then the scope of the claim is adequate. And I would think that you would be able to describe an enabling question. Mr. Gilmour, you describe the claim as a means plus function claim. Is the software a process or a structure? Well, the corresponding structure is the... So you're seeking a structure. What is the structure you're seeking here? The structure would be the software instructions that carry out... Is this a step plus function or a means plus function? It's a means plus function. Okay. Then what's the structure? The structure would be the corresponding algorithm that's describing the destination. The corresponding algorithm. The algorithm is a process, right? Yes. You're having a lot of trouble here, aren't you, with using means plus function in this context. Well, when we speak of algorithms, the steps of an algorithm are usually functional in nature. So you'll have a situation in which the representation of the algorithm is like, let's say... So what is your most convincing evidence that you put some structure... ...to your specification? The structure would be the flowchart that says output... Figure 8A. Is that your best thing? Well, I think the output means... Yeah, this is claim 61, 64, 67, but what, figure 7? Is it critical to your argument whether it's a means plus function or a step plus function? In either case, it refers back to the specification. I think that's correct, as long as we can find the representation of the algorithm in the specification. And it doesn't avoid the reference back to the specification by describing it as a means rather than a step? No, I would agree with that. Is there an algorithm in these flowcharts which are boxes with a few words in them? Well, I think we would need to talk about it. I think that depends on the particular nature of the function that we're looking at. We've looked at these as well as we can from your briefing, but we have boxes. Three boxes, eight boxes, ten boxes with a few words in them. Is that an algorithm? Well, I think that it can be, depending on how complicated the function is. If the function is do one thing, then the box that says do that thing, and I kind of do the text that says, you know, it outputs text using DDE. If that is a single thing, I don't see, if you had to put more in it to constitute a representation. But the algorithm has to be specific, detailed enough to define the invention here, to provide structure for the claimed function. Well, I agree with that, but when the function is just outputting data into another application, saying output it using DDE should be sufficient, given that people of skill in VR already know, and I would think that most software patterns which are written in this fashion, using a flowchart and the contained function, with labeled block diagrams and text that says this is what you do, are likely to be invalid if we're going to require more specificity. Well, it should be specific enough for someone to be able to look at the pattern and determine what the specific determinations and the outputs are, and how the computer-related applications would be applied. I'm speaking about Claim 60, which is very, very broad. I don't think so. Saying output to another application using DDE is reasonably specific. I mean, they specified exactly the communications channel that it uses, and we know that that communication channel is compatible with multiple destination applications. But how do we know that? Because a person of skill in VR knows that, and we can use the knowledge of a person of skill in VR in order to flesh out that structure. But what happens if DDE is not available? We're not in a Windows environment? Well, if we're not in a Windows environment, we would use... But then that's all we have is DDE. What if we're not in that environment? Well, I think that we would have equivalent communications processes. Your claim doesn't specify, and this claim has a broad function. It means the only structure you've given us is DDE. What happens if we're not in Windows? Well, if we're not in Windows, I think we would look to effective equivalence of DDE. In Windows, there are various other communications facilities, and if we're in a different... But if we're in some other operating system, I think we would look to similar inter-process communications facilities. Let's hear from the other side, and we'll save you a little bit of time. All right. May I please report? I'd like to first address the issue of Claim 60 and the means for outputting. I think it's important to understand that our position is not that a person with ordinary skill in the art would not be able to write code that would output words into more than one application program. The fundamental problem with Claim 60 is that the function of outputting into more than one application program is nowhere described in the patent, and nothing clearly links, as the patentee is required to do, the DDE protocol with the function of outputting into multiple application programs. Why can't one with a skill in the art... This is just keeping track of audio inputs and words. It just keeps tagging. You tag something and keep track of the tags. Why can't one with a skill in the art do that? This is 1996 when this was filed. Come on. Well, Your Honor, the tagging of the words is not the output means, and All Voice is not contented that it is. All Voice's contention that the output means is solely the transmission of messages using the DDE protocol to the target application program. I understand that. I'm looking at the invention of the claim in a broader sense, and it's telling you, as you know, it's just tagging audio and words and keeping track of them. That's pretty simple, isn't it? Well, it is pretty simple, Your Honor, and it's our position that the claims are obvious for that reason. Well, that's not what we're worried about. We're worried about whether or not this is definite. Why can't one with a skill in the art tag words and keep track of them? That's just easy. A person with skill in the art can tag words and keep track of them. The problem with the patent is that no structure for outputting the words into multiple application programs is clearly linked with that function in the patent specification. That is the quid pro quo, as the fault proof case makes clear, of the patentee using the means plus function format in claiming. They have to clearly associate the claimed function with specific structures, not simply... Well, the trouble you have in software patents is, of course, we all know there's thousands of ways to do the same function with software. So, to the extent you specify one algorithm, anybody can get around that algorithm with 50 different ways that they've done since they were in grade school. You have to claim functions. You have to have boxes. This court has somewhat repeatedly said, that's good enough in the cyber world of software patents. Why isn't this good enough? Then you go back and make your obviousness argument, which is where this case probably should have been litigated. It's good enough when the patent clearly describes the function and the means for implementing the function would be apparent to a person with ordinary skill in the art reading the patent specification. The problem with this patent is the basic function itself is never described. Claim 60 was never described in the patent in the first place before it was amended by the applicants to avoid prior art. The prior art patent, the prior art digital dictate, did exactly the same thing that this patent did, except different versions output in the different application programs. And so the only novel idea in Claim 60 was the idea of combining in one program an output means that would output into these different application programs. Would DDE disclosure be sufficient at that point? Your Honor, DDE disclosure is absolutely not sufficient. The DDE disclosure is a communication channel that allows data to be transmitted from one program to another. But in order to write an output means that used DDE, the messages that were sent would have to be tailored to a specific application program because different application programs understand different output messages to convey the data. So the mere recitation of DDE in no way conveys the concept of make it universal. But would it do that to someone who ordered mirror skill in the art? It would not because a person ordering skill in the art would understand that a DDE based protocol was application specific. And unless there was some description in the patent that said, well, we're going to use this with more than one application so we have to take into account the different languages, so to speak, that these applications speak and output different messages depending on the application, there's not even a hint in this patent that that single output means is intended to be used in more than one application. Would anyone in this field know that? Sure. Your Honor, a person in this field will understand that DDE in general can be used with a variety of applications, but the supposed distinguishing feature that is claimed in Claim 60 is the idea of designing a particular DDE protocol that worked with more than one application. I'm not a computer scientist. I can figure out the basics of tagging and keeping track of things. And why doesn't figure 8a do it? Step 55, determine identifier tag, retrieve audio component. Why doesn't that do it? Why doesn't figure 8a, it's a somewhat schematic box by box algorithm. Well, again, Your Honor, the tagging of the words is a different function and is claimed in different claims in Claim 60. Claim 60 does not require the tagging of any words. Claim 60 is extremely broad and simply says output words into more than one application program and play back the audio associated with them. And the outputting means it simply requires the transfer of the words from one application program to another. And yet the very distinguishing feature that they used to distinguish the prior art which was the ability to output into more than one such application program is nowhere described in this patent. And it's not even hinted at in the single sentence that describes the use of DDE. It simply says that DDE protocol is used to output the words into one application program. But it says at least one, not more than one. Well, the description of DDE, which is at the top of column 7 of the patent, line 3, talks about a single embodiment and simply says that in that embodiment DDE is used to output the word into the application program text processor application 13. The specific embodiment described in this patent only has one target application. There is no description of using this invention to output into more than one application program. So the very basic function... It's a different application. You just put another tag on it. You can have more than one tag on a given word or a given audio signal and so you have more than one tag from more than one application. It still is a little bit academic, isn't it? Your Honor, the tagging of the words has no bearing on the function of outputting them to the application. I don't understand that. I'm dealing with the broader invention. Again, Your Honor... Where there are different applications, all you do is just modify it to fit that application. It is not our position that a person's going to argue and not figure out how to do this. I agree with you entirely on that point. It isn't even figure out, it's kind of they understand it by looking at it, which is the definiteness question, isn't it? They look at this and say, okay, if I'm going into a different application, I'm going to do Excel, I'm going to do Lotus Note, I'm going to do Word Perfect, or whatever, right? Just flip into that system. Well, Your Honor, the record reveals that Old Boy's own commercial product, Word Express, which did use DDE, was application specific and didn't work with multiple application programs. So even the inventors, when they wrote their commercial program, didn't use this teaching to develop an interface that actually worked with multiple application programs. I think there's no better proof for the proposition that this teaching and this patent does not inherently describe the person's skill in their argument. They should use an interface that works with multiple application programs. That is the only thing that distinguishes... The prior art also output into application programs. The digital dictate output into Microsoft Word, output into Word Perfect, output into AmiPro, but they use different versions. And the only supposed invention here is to combine them all into one. This patent never says to do that. And so there is no description of the function of Plan 60 anywhere in this patent. And for that reason, the obligation to clearly link that function structure is also absent. And if the Court doesn't mind, I'd like to turn now to the best motor argument for the remainder of my time. The best mode of Claim 73 of the patent... Can you show us in the record the two elements of this? First, a clear indication that the inventor felt that there was a best mode, and second, that there was active concealment? Absolutely, Your Honor. With respect to what is the best mode, there can be no doubt that the inventors preferred an interface that was able to play back audio even after keyboard input. No, no, they have to perceive that cell range macro was the way to do it. Where does it say in the record, we have developed, we're going to use cell range macro, and we're going to keep that away from everybody else? Your Honor, it is not Nuance's position that the cell range macro per se is the best mode. It is our position that the best mode is the functionality of being able to play back audio data even after keyboard edits. And however it is implemented, that's not the best mode. The best mode is having that feature at all. And the problem with this patent is, that was the key feature that made their commercial product a success, and yet that is the one thing that is not enabled by this patent specification. And so Claim 73, to be a useful product, has to have this best mode feature, and I'll get to the record sites in a second, it's not enabled, and so they claim something, and yet they hid from the public the way to make, the really useful way of implementing the invention. But the issue is concealment, and it would be separate. Well, it's concealment of the enabling disclosure, Your Honor. Concealment of the best mode. That's what the statute requires for invalidity. It's a different concealment, not accidental or whatever. I believe the case law actually states that concealment may be accidental or deliberate. If you know the better mode, you have to know the better mode, and it has to not be disclosed. That's right, Your Honor. And it's no question that the inventors knew of the better mode, their commercial product embodied it before they even filed a patent. They knew it was better at the time. Let me get to the record site. The commercial product came along after the patent. No, Your Honor. It was already on the market before they filed a patent. And the testimony of the inventors is definitive on this issue. Mr. Mitchell, who was the lead inventor, testified that without this feature, he was able to break the invention in two seconds by hitting the letter S to add an S to the end of a dictated word, and then the link stopped working because all the words moved relative to their original positions. And he also testified that once that feature was implemented, he believed that the product would be a winner. That's at 8506 and 8509 of the appendix. And Mr. Hurd testified, another one of the inventors, that the whole point of the links was to allow words and audio to be associated even after... But these might have been improvements on the basic patent. These might be ways to improve upon the system. Nonetheless, it worked. Well, Your Honor, an improvement to... It could have been claimed later as an improvement patent or whatever. Under the Bayer case, the proper test for whether something should be considered a best mode of the invention is whether it materially affects the properties of the claimed invention and whether or not it was a routine part of making the invention. It's quite clear from the record this was not routine. It took the inventors months to solve the problem. They testified that it was one of the hardest things they faced during the making of the invention and that the recitation of the description in the patent, which simply says update the links after the words have been edited, was simply restating the crux of the problem and a problem that it took them three months to solve. And it's quite clear that they preferred this as the preferred embodiment of the invention. Mr. Mitchell said it made it a winner. Mr. Hurd said the whole point of the invention was to have this feature. And the feature is recited in the patent in the description of the preferred embodiments. We know that the preferred embodiments... That's just another word for the best mode. And so they disclosed... They referred to the best mode in the patent, but they failed to enable it. And by not enabling it, they hid from the public the one thing they needed to know in order to make a product that was as good as the commercial product they already put on the market. And so the fundamental deal that a patentee makes in order to get a patent, which is to disclose their full knowledge of how to make and use the invention in the best possible way, was broken in this case. Where's the active concealment in the record? Well, the active concealment is the knowledge that the product was already in the market, the inventors knew how to make a better way of the invention and did not disclose in the patent how to do it. And I think that, you know, if you look at, for example... What if they had meant to claim that as an improvement down the road? Well, Your Honor, whether or not they claimed it as an improvement down the road, they already were in possession of a preferred embodiment of a best mode at the time they filed the patent. They considered it a best mode. They considered it a best mode. They didn't just consider it part of the operating machine. They considered it a best mode. It's unequivocal that Mr. Mitchell said that this is the feature that made the product a winner. Mr. Hurd testified that it was the whole point of the invention. Without this feature, a single edit to the dictated words makes it impossible to play back audio. We're on summary judgment here. Is there a judgment call on whether a commercial product shows deliberate concealing? If it happens to be in the product, that it's deliberately concealed. If it's not in a patent, that may be claiming only a part of what's in the product. Maybe they broke it into three patents. Your Honor, is that anywhere in the record? Is there any development or active concealment as opposed to just they didn't claim the whole thing? Your Honor, there's nothing in the record that shows some kind of conspiracy to hide this information from the public. Is there anything in the record that shows concealment? Well, I would say that under the case law, under Bayer, inadvertent concealment is sufficient to violate the best mode requirement. And there was certainly at least inadvertent concealment because they had possession of the best mode. It was their subjective belief that this is what made the invention a viable product. And they specifically denied it. That's all you have. What you have is just that it was in their product and they didn't claim it. So that's, in your mind, sufficient to show concealment? No, Your Honor. It's not simply that it was in their product. It didn't develop anything beyond that. The inventor testified that he believed that this feature is what made the product a winner and that another one of the inventors testified that this feature was the whole point of the invention. The whole point of having link data is to be able to maintain the links even after words are moved. And they did not enable that feature. The one thing that allows you to actually use this thing to edit documents without it being destroyed from one edit is to be able to maintain links even after words have been moved in the document. And they did not enable that. The record is... The evidence is unambiguous. Nuance's expert testified it wasn't enabled. There's no evidence from Allvoice's expert that it was enabled. And their own programmer, Mr. Corbett, said that the description in the patent was insufficient to enable someone to build it. All right. We must move on, Mr. Kavak. Thank you. Thank you. Thank you, Your Honor. Do you think it's wise just to be able to tell by the amount we've been over? Yes, Your Honor. Thank you, Mr. Kavak. If I could skip back to claim 60%... There's just two points that I would like to make on this before we talk about best known. One of the things that Mr. Kalogny was saying is that DD messages have to be tailored. But I think that this is really just a dispute, a fact between the two experts as to whether there's going to have to be any special tailoring to be done. Allvoice's expert testified that the structure of the DD message is the same from destination application to application. So it's saying that... So given that the patents presume valid and the burden is of clear and convincing evidence, I don't think the dispute between those two experts can lead to the conclusion that the claim is insoluble and ambiguous. And then there was some discussion about Allvoice's commercial product. I'd just say that I don't think that what they chose to sell in the marketplace has much to do with whether the claim itself is ambiguous. And Allvoice had pretty good commercial reasons to sell versions of it that worked with only one text processor at a time. In particular, back in those days, people didn't usually have more than one text processor at their home or place of business. I mean, today we have WordPerfect and Word probably all loaded onto our computers. But in those days, people generally just had one or the other, so there wasn't much reason for them to sell product that would switch between those. Okay, let's go back to that. Now, Mr. Kalidin said that they don't contend that the cell range macro per se is the best mode, and that the best mode is just this idea of functionality of maintaining linked data so that you can get playback after manual editing. And I don't think that that can be a best mode of claim 73. I don't think that that's a mode at all. A mode is a way of making or using. That's a feature. That's an invention. And it's something that's not claimed by claim 73. Everybody in this case agrees that claim 73 just claims a fairly basic playback function. But it just doesn't say anything about monitoring for user ads, which is what the cooking part of this assertiveness mode does. And it doesn't say anything about updating the data, which is what the cell range macro does. So it's not... Oh, and the other part of what is actually a mode here rather than an invention or a feature is disabling certain features in Microsoft Word. And that obviously cannot be part of the best mode for claim 73 because it doesn't claim compatibility with Microsoft Word. So it's not a discrete limitation of claim 73. So since it's not an embodiment of a discrete limitation of the claim, it's not the best mode, unless it's necessary to the user or enjoyment. What about claim 60? I'm sorry? What about claim 60? Is this issue raised there as well? No. Claim 60 was found to be indefinite, so there wouldn't be a best mode challenge. So there's no best mode objection to claim 60? I mean, there's an indication in the record that it would have been challenged on best mode had it survived the Markman hearing. But since it did not, it was gone. I mean, it couldn't have been asserted past that point. So no, there is no best mode challenge presently. If it's reversed, presumably a better challenge will be raised. But then the record can be developed without that sort of challenge at the appropriate time. But you didn't appeal a claim construction? No. With respect to claim 73? We do. We appeal a claim construction as to claim 73C. C. Not only C, but at the other part. No, no. So would the law dictate, the digital dictate, to each part of C? I don't think so because, well, it wouldn't be part of 73 because digital dictate doesn't have any link to it. Yeah, digital dictate doesn't have any link to it. All digital dictate has is a list of recognized words.  It's created, maintained, and stored in a text processing application. Should that be part of the application program to form dictate? No, because the text processor is forming the bookmark. So it's not. I mean, digital dictate doesn't use them. It uses a meta tag. It's really quite different. Are there any other questions? Thank you. Thank you.